

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 2-07-280-CV

IN THE INTEREST OF M.B.,
M.M.A., M.G.A., M.R.A., AND
M.W.A. JR., CHILDREN

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant M.A.M.B. appeals the trial court's order terminating her parental

rights to her children, M.B. (Beth), M.M.A. (Mona), M.G.A. (Greg), M.R.A.

(Rachel), and M.W.A. (Will).[2] In eight points, appellant argues that the evidence

---

[1] *See* TEX. R. APP. P. 47.4.

[2] The names of minors and parents have been redacted and replaced with fictitious names in accordance with proposed TEX. R. APP. P. 9.8, 71 TEX. B.J. 287–88 (Tex. 2008, scheduled to take effect Sept. 1, 2008) (authorizing appellate courts to redact the names of minor children and parents in appellate proceedings following parental-rights termination proceedings or juvenile court

is legally and factually insufficient to support the endangerment, noncompliance, or best interest findings. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) & (2) (Vernon Supp. 2007). We affirm.

## II. Background Facts

Appellant grew up in New York. In 1997, at the age of eighteen, she became pregnant with her daughter Beth when J.J., the man she was living with, raped her. In 1998, appellant met a visiting family friend, M.A. (Andrew), and moved to Texas to be with him. Appellant and Andrew lived with Andrew's mother for six months before moving into the Lewisville Apartments.

Appellant and Andrew had Mona in 1999 and Greg in 2001. In 2001, the Texas Department of Family and Protective Services (TDFPS) received a referral regarding the physical and dental neglect of the children; TDFPS referred the case to Family Based Safety Services[3] (FBSS), but appellant did not complete those services.

Appellant and Andrew were married in 2002, and they had Rachel in 2003. In June 2004, TDFPS received a referral alleging that appellant and

proceedings and replace them with fictitious names).

[3] Family Based Safety Services is a program in which a TDFPS worker helps a family become self-sufficient by working with the parents on a weekly or biweekly basis and by offering help with services and errands such as appointments and counseling.

2

Andrew were abusing alcohol and not properly supervising the children. TDFPS disposed of the case as "Ruled Out with Risk Indicated" and referred it to FBSS. However, before FBSS could become involved, appellant, Andrew, and their children moved back to New York in July 2004. While in New York, appellant met A.H. (Harold) and moved in with him, taking the children. Child Protective Services in New York became involved after learning that Harold was a sex offender. Upon learning that Harold was a sex offender, appellant then moved back to Texas with Andrew while pregnant with Harold's baby.

When they returned to Texas, appellant and Andrew moved in with Andrew's nephew W.A. (Walter) and his wife J.A (Jill) for a few months. In November 2004, TDFPS night response investigator Jamie Parsons received two referrals alleging that appellant was aggressive towards her children, that she was not seeing to their dental needs, that she had previously lived with a sex offender in New York, and that she was pregnant with the sex offender's baby. Parsons visited appellant in Lake Dallas at Walter and Jill's house. After seeing the children, Parsons became concerned about their teeth because the three older children—Beth, Mona, and Greg—had severe tooth decay. Rachel had also recently been bitten by a brown recluse spider. Parsons enrolled appellant in Medicaid and took the children to the dentist. Parsons tried to educate appellant on the proper foods to prevent tooth decay because appellant

3

tended to buy junk food for the children. Appellant was also unemployed most of this time. Parsons could not substantiate the allegations regarding physical abuse.

Jill testified that she had to ask appellant to leave their home because appellant would not keep herself or the children clean, did not contribute or help out around the house, and did not have a job. Jill finally kicked appellant out of the house after appellant left a dirty bandage on the kitchen counter by the children's food. Jill allowed the children and Andrew to remain, but appellant continued to come by the house. Once, appellant threatened Jill, and Jill called the police. At that point, Andrew moved out with the children to live with appellant.

Appellant gave birth to Will in early 2005. Appellant and Andrew moved to Arbor Creek Apartments in Lewisville for about eight months until they were evicted because Andrew lost his job and appellant did not make enough money at her job at IHOP to cover the rent. The family then moved to Budget Suites

in Lewisville.[4]  Initially, the family stayed in a two-bedroom suite, but they had to downsize to a one bedroom because of financial difficulties.

TDFPS worker Parsons continued to work with appellant between November 2004 and March 2005 until she referred appellant's case to FBSS. Jennifer Chappell received the case from FBSS in March 2005 and met with appellant on April 11. TDFPS wanted appellant to complete parenting classes, a psychological evaluation, individual counseling, and an early childhood intervention (ECI) evaluation because Rachel did not appear to be mentally "on target," and she was not speaking at eighteen months. After the initial visit, Chappell met with appellant once a week and worked with her regarding appellant's inability to meet her family's financial or basic needs, her lack of parenting, and the uncleanliness of the home. For example, appellant's apartment was dirty, filled with flies, and had an odor; appellant also had a puppy and two rabbits that she did not clean up after. Dirty clothes, dirty dishes, and dog feces were scattered throughout the apartment. Chappell

_____

[4] At some point, appellant, Andrew, and the children moved to New Mexico and briefly lived with appellant's mother, but they stayed only for about two months because appellant and her mother had a physical argument. During the argument, appellant's mother threw a phone at appellant, missed, and the phone hit Greg. Appellant retaliated by kicking the screen door which resulted in a piece of metal stabbing appellant's mother. Police arrested appellant, and the family returned to Texas.

5

testified that appellant would clean the apartment but then allow it to get dirty again.

The children were usually dirty and ran around unsupervised. Chappell testified that they looked like they had not been bathed and that they had an odor; their faces were brown with dirt and the bottoms of their feet would be black. The clothes the children wore were dirty and did not fit well. Because the children did not have adequate clothing, Chappell would take them clothes twice a month, but she never saw them wear the donated clothes. Chappell also helped appellant get food stamps so that appellant could provide more nourishing meals. The children also had lice four times in four months, which appellant would treat.

Although appellant completed parenting and homemaking services, she refused to complete a psychological evaluation and counseling. Appellant set up the ECI evaluation but was not at home for the appointment. Appellant and Andrew were never able to pay their rent, and neither appellant nor Andrew worked consistently.

Although TDFPS received another referral in May 2005 regarding neglectful supervision, Chappell closed appellant's case in July 2005 because appellant had participated in some services and had made progress. The basic needs of the children, such as a place to sleep, food, clothing, and medical

6

care, were met, so TDFPS did not remove the children from appellant's care. But TDFPS received yet another referral in August 2005, which was also referred to FBSS.

At Thanksgiving 2005, Glenda Revert, who was a driver for Durham Transportation, became acquainted with appellant and the children because they were on her bus route. Revert asked Beth and Mona to spend the night with her and offered to help appellant with her laundry. She testified that when she went to get appellant's laundry, she noticed that their room at the Best Value Inn where they were staying was not well-kept and smelled like urine or a locker room. She took appellant's laundry and gave the girls a bath because they had lice.

In December 2005, TDFPS received another referral that the children were being neglectfully supervised and that they were sexually acting out. Former TDFPS investigator Kelly Backhaus interviewed Beth and Mona at school. Beth told Backhaus that they were occasionally left alone when appellant went to the hotel office and that Andrew used drugs, but appellant and Andrew were separated. Mona, however, said that they were not left home alone and that their parents had used drugs in the past. Backhaus then called appellant and met with her the next day. Backhaus observed that the home had an odor and the children were slightly unkept. Appellant told

7

Backhaus that she did not use drugs, but Andrew had used drugs in the past. Appellant also told her that Andrew was paying the rent even though he was not living there.[5]

Backhaus next requested a risk staffing, which occurs when a family has a history with TDFPS or the potential for great risk and several supervisors review a family's history and assess what, if anything, should be done. The risk staffing took place on the morning of January 17, 2006, and TDFPS determined that more information was needed before proceeding to remove the children. Coincidentally, that afternoon, Backhaus received another referral regarding a large untreated burn on Will's left hand. After the referral, TDFPS took immediate action. Backhaus went to talk to Beth and Mona again about Will's burn, and the girls gave different stories about what had happened. On January 18, 2006, Backhaus spoke with Andrew on the phone. Andrew told Backhaus that he noticed the burn on Will's hand when he visited, but he could not get any more information from appellant. Andrew also stressed to Backhaus that appellant needed help.

---

[5] The record indicates that Andrew did not continuously live with appellant and the children, but he did contribute to the household and visit the children.

8

When Backhaus arrived at appellant's home at Budget Suites, she observed that food was lying around, that the heater was broken, that the babies were in soiled diapers, that there were no sheets or pillows on the bed, and that there was an odor. Additionally, the children were dirty. For example, Rachel had marker and mascara on her face, and Greg had black teeth. Will's hand was wrapped, and appellant said that the babysitter had thrown a cigarette on the ground while it was still lit, and Will had grabbed it. Appellant also told Backhaus that she had taken Will to the hospital and that he was allergic to the tape they used, which explained the other sores on his hand.

Backhaus removed the children and took them to the TDFPS office to conduct a more thorough body check, which revealed that the two youngest children had diaper rashes. The children also had lice. Backhaus took Will and Rachel to a medical center where they were treated for influenza and ear infections, and Will was treated for his burn.

TDFPS placed the children with foster parent Kathy in January 2006. Kathy testified that the children had behavioral problems. For example, they were disorderly, disrespectful, and defiant. The children did not know how to appropriately express their feelings; for example, Mona would tear up her bedspread and wall paper when she did not get her way. The children also sexually acted out.

Around the time the children were removed, appellant worked as a bus aid for the Lewisville Independent School District and as a waitress at IHOP. After TDFPS removed the children, appellant continued to live at Budget Suites, but shortly thereafter in July 2006, she and her boyfriend Kevin got a mobile home together in Lake Dallas. Kevin became physically aggressive, and she stopped seeing him in October or November 2006. Although appellant worked at IHOP between August and November 2006, she could not afford the mobile home after Kevin moved out, so she moved in with a friend, Dee, in Lewisville in December 2006. Dee testified that appellant helped her around the house and was clean. However, she stated that appellant moved out because of her lack of employment and transportation; appellant also placed a financial strain on Dee. Appellant then moved to Kansas and lived with her mother for a month before moving to an apartment in February 2007. Appellant also worked at a Waffle House in January 2007.

CASA assigned volunteer Janet Aune to appellant's case in January 2006. Aune attended all the visitations except one. At visits, appellant told the children that they were going home with her, made negative comments and accusations about the foster home, and burdened the children by making them feel sorry for her. Aune testified that there was a lack of bonding between appellant and the children and that there were no signs of attachment. Laura

10

Greuner, the children's therapist, also testified that they did not have a strong attachment to appellant. After visitations, the children exhibited destructive behavior and acted out. For example, Greg used scissors to cut his hair, body, and clothes. In October 2006, Beth, Mona, and Greg told Aune that they did not want to attend visits any longer. In February 2007, TDFPS discontinued visitation.

After a jury trial held May 21 through May 24, 2007, the trial judge, in accordance with the jury verdict, held that appellant (1) knowingly placed or knowingly allowed Will to remain in conditions or surroundings which endangered his physical or emotional well being, (2) engaged in conduct or knowingly placed all of her children with persons who engaged in conduct which endangered their physical or emotional well-being, (3) failed to comply with the provisions of the service plan, and that (4) termination was in all of the children's best interest.[6] *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (O), (2). Appellant timely filed this appeal.

### III. Standard of Review

---

[6] The trial court also terminated J.J.'s parental rights to his daughter Beth; Andrew's parental rights to Mona, Greg, and Rachel; and Harold's parental rights to his son Will. None of them have appealed the trial court's order.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App. — Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination

12

is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

**A. Legal Sufficiency**

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination

13

were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

## B.   Factual Sufficiency

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm

14

conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

### IV. Endangerment Findings

In her third and fourth points, appellant argues that the evidence is legally and factually insufficient to support the jury's findings that she engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered their physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(E).

Under subsection 161.001(1)(E) of the Texas Family Code, the term "endanger" means to expose to loss or injury, to jeopardize. *Id.; Boyd*, 727 S.W.2d at 533. Accordingly, when analyzing the trial court's findings under subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the

15

parent's conduct, including acts, omissions, or failures to act. *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). Termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *D.M.,* 58 S.W.3d at 812 (explaining that under subsection (E) a court may order termination of parental rights if that parent has engaged in conduct or knowingly placed the child with persons "engaging in conduct which endangers the emotional or physical well-being of the child"); *In re D.T.,* 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 227–28 (Tex. App.—Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id*.

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *D.M.*, 58 S.W.3d at 812. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

**A.    Health and Living Conditions**

16

Here, the evidence indicates that appellant had difficulty maintaining a clean and stable environment for her children. Additionally, she did not ensure that her children's basic hygiene needs were met.

Andrew testified that TDFPS removed the children from appellant's care because the apartment was not clean, and the children themselves were not clean. He also stated that the children often looked dirty and that they had lice on and off for a couple of years. Andrew testified that the children were never homeless and always had food, although sometimes not an abundance of food. He stated that appellant would bathe the children and put their school clothes on at night before they went to sleep.

Revert, who once went into appellant's apartment to help her with the laundry, testified that the apartment was not well-kept and that it smelled like urine or a locker room. She observed that the kitchen was dirty and filled with old wrappers, and food was sitting out. Caseworker Chappell also stated that appellant's home was dirty and had an odor. Kelly Duncan, a friend from church, also visited appellant's home, looked in the window, and noticed its uncleanliness.

Beth also told Greuner and Kathy that there were bugs all over the house and in their food, although sometimes Beth told Greuner that nothing was wrong with their home. Mona was embarrassed to have people over because

17

of the condition of their house. TDFPS worked with appellant regarding the cleanliness of her home, and although appellant would clean the apartment, she was unable to maintain it.

The evidence also demonstrates that appellant neglected the children's dental and personal hygiene. Jill testified that she had to ask appellant to leave her home after appellant refused to keep herself or her children clean.

Chappell testified that the children did not have adequate clothing, and the clothing that the children did wear was dirty and did not fit well. In the winter, the children did not have coats. Chappell provided clothing for the children, but she never saw them wear any of the clothes. Appellant told her that the clothes were stolen. Additionally, the children were usually dirty, had an odor, and ran around unsupervised. Chappell also testified that the children did not have nourishing meals.

Revert stated that Beth and Mona spent the night with her and that both girls had a bad infestation of lice. Additionally, the girls' teeth looked like they were not properly taken care of although they did not appear rotten or decayed. Duncan testified that the children were usually not clean and had dirty fingernails. Three-year-old Rachel frequently had makeup on her face.

Appellant's friends and coworkers, however, testified that her apartment and children were clean. Dee, who allowed appellant to live with her from

18

December 2006 to February 2007, testified that appellant was clean and helped around the house. Pamela Rasmussen and Lisa Hektor, who lived at the same apartment complex and worked with appellant, also testified that appellant's home and children were clean.

The record demonstrates that appellant struggled with maintaining a clean and healthy environment for herself and her children. Additionally, appellant had difficulty keeping her children appropriately clean and clothed because they were regularly dirty and had lice. Although there is also evidence to the contrary, the jury as fact-finder was free to assess the credibility of all the witnesses and determine that the children's living conditions were inadequate. *See J.P.B.*, 180 S.W.3d at 573.

## B. Service Plan

The evidence also indicates that appellant did not successfully participate in her service plan.[7] Backhaus testified that TDFPS initiated FBSS with appellant three times, but appellant did not participate until the third attempt. Appellant's service plan required her to complete parenting classes, a psychological evaluation, and recommendations from the evaluation, which

---

[7] Although failure to comply with a service plan is an independent ground for termination, the same evidence is also relevant to the analysis of sufficiency under subsection 161.001(1)(E). TEX. FAM. CODE ANN. § 161.001(1)(E).

19

included individual counseling and an ECI evaluation. TDFPS also addressed issues such as meeting the family's financial needs, parenting skills, and cleanliness. Appellant completed parenting and homemaking services. She also participated in a psychological evaluation, but she did not complete it. Appellant did not participate in an ECI evaluation. She also attended counseling, but she was not successfully discharged.

Therapist Michelle Greer, who began seeing appellant in February 2006 as part of her service plan for individual counseling, testified that she initially thought appellant was making progress, but then discovered appellant was not reporting things accurately to her. Greer unsuccessfully discharged appellant from counseling because appellant was not being honest with her. For example, appellant told Greer that she was working when she was unemployed; she also told Greer that she was not seeing Andrew, but Greer saw Andrew waiting for appellant after a session. Greer stated that appellant was involved with a lot of instability and lacked a support system.

CASA volunteer Aune also testified that appellant did not comply with her service plan. Aune did not know if appellant attended domestic violence or anger management classes. Aune testified that appellant did complete parenting classes, but she did not secure stable housing for more than the required six months. Aune also stated that appellant did not have a steady

20

income because of her volatile work history. Caseworker Daphne Schwartz testified that TDFPS did not believe appellant had complied with her service plan and it was in the children's best interests for appellant's parental rights to be terminated.

### 1. Employment and Residences

Additionally, appellant did not maintain a steady job or stable housing for at least six months, which was required by her service plan. The evidence shows that appellant worked as a bus assistant for Durham School Services from the fall of 2005 to the spring of 2006. Appellant's supervisor, Deborah Wortham, testified that although appellant had a job with them, she would disappear. For example, in the fall of 2006, Deborah attempted to contact appellant regarding the new school year, but she did not receive a response. Appellant finally contacted Deborah's supervisor, but she still did not return to work, and Deborah testified that appellant "left our employment again." Appellant came back to work in January 2007 and worked for several weeks until she did not show up one day. Appellant then came to the office with crutches and explained that she had a foot injury. Deborah testified that they held her job for thirty days but that appellant did not contact them again so she was terminated for job abandonment. Appellant also worked at IHOP from August through November 2006, but she quit showing up for work. At one

21

point, appellant worked for a daycare where her children attended.

Aune testified that she had concerns regarding appellant's work history because of appellant's pattern of abandoning her jobs. Aune also testified that appellant's bad work history prevented her from maintaining a steady income to provide for her children.

The record shows that appellant also had numerous residences. In the seventeen months that TDFPS had the children after removal, appellant lived in six places, including a motel, a mobile home, with a friend, and in several apartments. Appellant also had a history of being unable to pay her rent. Appellant admitted that she understood that part of her service plan was to maintain a steady place of residency for six months but that she was not able to do that because TDFPS told her to move.

**2. Visitation**

The evidence reflects that appellant attended visitations regularly, but after the children saw appellant, they would exhibit destructive behavior. For example, Greg cut himself with scissors. When Greg's teacher removed Greg's scissors, he stole other students' scissors and continued to harm himself. When all of the scissors were removed, Greg resorted to stealing other items in the classroom or physically attacked his classmates. Further, appellant acted inappropriately at visits. For example, she laughed if one of the children made

fun of another, encouraged the children to make fun of Andrew, and tried to get sympathy from the children by using physical problems. Appellant also spoke negatively of the foster family to the children. In October 2006, the children decided that they did not want to attend visitations with appellant. However, appellant testified that the children did not stop attending visits because of her but because they did not want to see Andrew.

The evidence indicates that appellant did not sufficiently work her service plan and that she was unable to maintain adequate housing or employment. Furthermore, despite attending visitations, appellant's interactions with her children negatively impacted their behavior to the extent that visits were stopped.

Based on our review of the entire record, we conclude that a factfinder could reasonably form a firm belief or conviction that appellant engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered their physical and emotional well-being. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's findings under subsection 161.001(1)(E).[8] TEX. FAM. CODE ANN.

---

[8] Because we conclude that there is both legally and factually sufficient evidence to support the jury's findings under family code section 161.001(1)(E), we need not address appellant's first and second points with respect to the jury's finding regarding Will under section 161.001(1)(D). *See*

§ 161.001(1)(E); *see In re S.B.,* 207 S.W.3d 877, 885 (Tex. App.—Fort Worth 2006, no pet.).  We overrule appellant's third and fourth points.

## V. Failure to Comply with Court Order

In appellant's fifth and sixth points, she claims that the evidence was legally and factually insufficient to terminate her parental rights for failure to comply with the provisions of a court order necessary to obtain the return of her children.  *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

Only one finding under section 161.001(1) is necessary to support a judgment of termination.  *Id.* § 161.001(1); *In re K.A.S.,* 131 S.W.3d 215, 225 (Tex. App.—Fort Worth 2004, pet. denied); *D.M.,* 58 S.W.2d at 813.  Because we conclude that there is both legally and factually sufficient evidence to support the jury's findings under family code subsection 161.001(1)(E), we need not address appellant's remaining points with respect to the jury's finding under subsection 161.001(1)(O).  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O); *see also* TEX. R. APP. P. 47.1; *K.A.S.,* 131 S.W.3d at 225.

## VI. Best Interest Findings

---

TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *see* TEX. R. APP. P. 47.1; *In re K.A.S.,* 131 S.W.3d 215, 225 (Tex. App.—Fort Worth 2004, pet. denied).

24

In appellant's seventh and eighth points, she argues that the evidence was legally and factually insufficient to support the jury's finding that termination of her parental rights was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2).

## A.    Applicable Law

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

(5)    the programs available to assist these individuals to promote the best interest of the child;

(6)    the plans for the child by these individuals or by the agency seeking custody;

(7)    the stability of the home or proposed placement;

25

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

B.    **Analysis**

1.    **Desires of the children**

At the time of trial, Beth was nine years old, Mona was eight years old, Greg was five years old, Rachel was three years old, and Will was two years old. The children's therapist, Greuner, testified that when she initially began seeing the children in the summer of 2006, they wanted to go home with appellant, but over time, they wanted to stay in their foster home. In fact, by

26

October 2006, the children decided that they wanted to discontinue their visits with appellant.

The evidence also shows that the three older children did not have a strong attachment to appellant and that they were excited about the possibility of living with relatives. Beth wanted to be adopted by her foster family, and Mona wanted to live with her aunt Jill.

**2. The emotional and physical needs and danger of the children now and in the future**

When TDFPS removed the children, Will had a severe burn on his hand, and appellant was not exactly sure what had happened. Appellant told Backhaus that she had taken Will to the hospital, but she had not given him any medicine. Appellant also said that the additional sores Backhaus noticed on the baby's hand were caused by an allergic reaction to the tape used. Additionally, Will and Rachel had diaper rashes, influenza, and ear infections, and all of the children had lice. Will also had pink eye. The record is also replete with evidence that the children had problems with their teeth and that their teeth looked black. However, foster parent Kathy testified that their teeth look dark because they had silver caps on them. Appellant testified that she kept the children's immunizations up-to-date and that she provided TDFPS with the children's medical records after they were removed.

27

The evidence also demonstrates that the children suffered from behavioral problems. Kathy testified that when the children first arrived in her home, they were disorderly, aggressive, disrespectful, sassy, and out of control. She stated that they did not know how to appropriately express their feelings and would yell, hit, push, shove, and scream.

Greuner testified that the children had a lot of issues such as anger, sexually acting out, and difficulty following rules. Beth and Mona had similar issues with not telling the truth, with sexually acting act, with being defiant, with not listening to their foster mother, and with not obeying rules. Greuner stated that Mona had additional issues because she had more unresolved anger and did not show remorse for her actions. Although younger than Beth, Mona was the bully and made fun of her siblings and manipulated them. Greuner testified that Mona's behavior had changed very little despite therapy. She also testified that all of the older children were physically aggressive. For example, the Boys and Girls Club suspended Mona for choking another girl, and Greg had kicked a girl in the stomach. Greg also cut himself, and he told Greuner that he did it because the other kids at schools did not like him, he hated himself, and he wanted to kill himself. Greuner also testified that in play therapy, Greg acted out against female toys, which was consistent with a family violence environment. Rachel was bossy, climbed the furniture, and threw temper

28

tantrums; Will was also aggressive and kicked his playmates at daycare. Kathy testified that Beth, Mona, and Greg had all been in trouble for stealing. Greuner testified that the children's behavior had vacillated since their removal. She stated that Greg had made consistent improvements, that Beth's progress had gone up and down, and that Mona had not made any consistent improvements or progress.

Greuner also testified that all of the children said sexual things and acted inappropriately. Revert, with whom the girls spent the night with one time, testified that they knew too much about sexual behavior. For example, Beth touched herself, and Mona danced provocatively. The children also got on top of each other and tried to engage in other sexual behaviors. Kathy testified that the girls showed off their chest, and Greg "mooned" the girls. The children also told Greuner that they had seen and heard their parents have sex. Greuner testified that she believed the children were exposed to sexual things but that nothing had been done directly to them.

The children also witnessed domestic violence. For example, they were present when their parents fought, and they saw Andrew hit appellant. The children were also present when appellant had an altercation with her mother in New Mexico, and Greg was accidentally struck by a phone. Additionally, Greg's actions in play therapy were consistent with a child who had been

exposed to family violence. Appellant also told Beth she was conceived because appellant was raped although appellant denied sharing this with Beth. Mona also knew of the incident, and she would make fun of Beth because of it. TDFPS could not substantiate any physical abuse.

Appellant testified that the children did not have any behavioral problems before they were removed. Other witnesses also testified that the children had never had behavioral problems. For example, Andrew testified that the children did not exhibit any anger problems or behavioral issues until they were placed in foster care, although he also testified that children were still better off because they were in a more stable environment. Revert testified that the children were good, quiet, and well-behaved kids although Mona had an attitude. However, Greuner testified that the children's behaviors had been ingrained in them long before they were removed.

**3. The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the children**

As noted above, the evidence demonstrates that appellant did not sufficiently work her service plan. As previously discussed, although appellant completed parenting and homemaking classes, she did not successfully complete a psychological evaluation or counseling. CASA volunteer Aune did not know whether appellant had attended domestic violence or anger

30

management classes. Appellant did not maintain stable housing for six months or consistent employment.

Additionally, the record shows that although appellant attended her visitations with the children, she did not act appropriately with them, and the children exhibited destructive behavior after seeing appellant. The record also shows that there was a lack of bonding between appellant and her children, although appellant would sit on the floor and play with the children or read to them. Appellant also encouraged inappropriate behavior by laughing and making fun of the children or of their father and by berating the foster family. TDFPS discontinued visits at the children's request.

The record also reflects that appellant did not appropriately see to the children's medical or nutritional needs. For example, church acquaintance Duncan testified that she noticed Will's burn and that appellant had tape applied directly to the wound. Duncan also observed that appellant had a bottle of medicine, which had the name scratched off and was outdated by two years. The children also repeatedly had lice and dental problems. Additionally, appellant had no regard for the children's proper nutrition. At visits, she did not bring healthy snacks or cut up the food for the younger children.

Furthermore, the record shows that appellant had a history of unhealthy relationships and domestic violence. Appellant had lived with a sex offender

31

and had maintained contact with men whom she had had volatile and sometimes violent relationships. For example, Duncan testified that appellant called her to come over and talk to Andrew because he had tried to strangle her. The record reflects that domestic violence occurred frequently in front of the children. Appellant also dated a man named Kevin who was physically abusive. Moreover, Beth told Greuner that Andrew had done drugs and that Rachel found drugs under the bed in what looked like a light bulb.

**4.     The plans for the children by these individuals or by the agency seeking custody, and the stability of the home or proposed placement**

Regarding future plans for the children, TDFPS's plan was for the children to be adopted by relative placement. TDFPS caseworker Daphne Schwartz testified that TDFPS originally wanted to place all of the children with their aunt Jill; however, Jill had four children of her own and five more would be too many. Schwartz also testified that it would be overwhelming for only one family member to take all five children. Additionally, the record reflects that Beth and Mona did not get along and fought constantly. At the time of trial, TDFPS planned for Mona and Rachel to live with Jill because they had good rapport and interaction with her and for Beth, Greg, and Will to live with other cousins.

32

Appellant also testified regarding her future plans if the children were returned to her. She stated that she had saved $1200.00 to get a two or three bedroom apartment, picked a day care, and worked out her work schedule with her boss so that she could take care of her children. Additionally, appellant had applied for Section 8 housing and assisted day care. She was also in the process of getting a car and worked at a Waffle House.

**5.    The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of appellant**

As for the parent-child relationship, there is evidence that appellant was affectionate and loving with her children, but there was not a strong bond or attachment. Although the record contains conflicting evidence regarding appellant's parenting skills, the jury assessed the credibility of the witnesses, and we defer to its determination. *See J.P.B.,* 180 S.W.3d at 573.

In sum, the record demonstrates that TDFPS had received between eight and ten referrals about appellant. Appellant's long history of neglecting her children; difficulty maintaining stable housing or providing for the basic needs of her children; lack of structure in the home environment, which included unclean living conditions and poor hygiene; inconsistent employment history with no guaranteed income; and inappropriate choices that put her children in danger, such as living with a sex offender and engaging in domestic violence,

33

all demonstrate that it was in the children's best interest that appellant's parental rights be terminated. *See* TEX. FAM. CODE ANN. § 161.001(2).

Viewing all the evidence in the light most favorable to the judgment, we hold that the evidence is legally sufficient to support the jury's finding that termination of appellant's parental rights was in the children's best interest. *See id*. Viewing the same evidence in a neutral light, we hold that it is also factually sufficient to support the jury's findings that termination of appellant's parental rights was in the children's best interest. *See id.* We overrule appellant's seventh and eighth points.

### VII. Conclusion

Having overruled all of appellant's dispositive points, we affirm the trial court's judgment terminating appellant's parental rights to Beth, Mona, Greg, Rachel, and Will.

TERRIE LIVINGSTON
JUSTICE

PANEL F:    LIVINGSTON, HOLMAN, and GARDNER, JJ.

DELIVERED: July 31, 2008

34